**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| GUIDEHOUSE INC.<br><br>Plaintiff,<br><br>v.<br><br>COMMUNITY FEDERAL SAVINGS BANK<br><br>Defendant. | Case No. ____________________ |

## COMPLAINT

Plaintiff Guidehouse Inc. ("Guidehouse"), by and through its undersigned counsel, states as follows for its Complaint against Community Federal Savings Bank ("CFSB"):

## PARTIES

1. Guidehouse is a Delaware corporation with its principal business located at 1676 International Drive, Suite 800, McLean, Virginia 22102. For purposes of diversity jurisdiction, Guidehouse is a citizen of the Commonwealth of Virginia and the State of Delaware.

2. CFSB is a federally chartered savings bank located at 8916 Jamaica Avenue, Woodhaven, New York 11421, in Queens County, within the Eastern District of New York. For purposes of diversity jurisdiction, CFSB is deemed a citizen of the State of New York, where, upon information and belief, its only office is located.

## JURISDICTION AND VENUE

3. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.

4. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Defendant CFSB resides in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this District.

## FACTUAL BACKGROUND

### *The Engagement Agreement*

5. On November 3, 2022, Guidehouse and CFSB entered into an engagement agreement effective as of October 31, 2022, for "Bank Secrecy Act / Anti-Money Laundering Correspondent Banking and Solution Review / Transaction Monitoring Coverage Assessment" ("BSA" and "AML") services (the "Engagement Agreement"). A copy of the Engagement Agreement is attached hereto as Exhibit A.

6. Pursuant to the Engagement Agreement, Guidehouse agreed to conduct a high-level review of CFSB's BSA and AML Program in relation to its onboarding correspondent banking-related controls and a review of its Transaction Monitoring coverage assessment. Specifically, Guidehouse agreed to (i) review CFSB's AML policies, procedures, and internal controls related to correspondent banking; (ii) recommend a future system Solution[1] for onboarding controls based upon that review; (iii) assess and evaluate CFSB's future onboarding controls after implementation of the recommended Solution; and (iv) conduct a high-level review of CFSB's current transaction monitoring coverage assessment in relation to its ability to effectively monitor correspondent banking-related transactions (collectively, the "Services").

7. Guidehouse billed its professional services monthly based on hours incurred at the rates set forth in the Engagement Agreement. In addition to professional fees, CFSB was responsible for reimbursement of out-of-pocket expenses at cost with no mark-up. CFSB was

[1] As used herein, "Solution" is defined as in the Engagement Agreement.

required to pay Guidehouse for its professional fees and expenses in accordance with the payment terms set forth in the Engagement Agreement. The Engagement Agreement expressly stated that "Guidehouse's invoices are due upon receipt, and payment of professional fees and expenses is expected within 30 days of the invoice date." *See* Exh. A, at 3.

8. The Engagement Agreement further provided: "Any objection to the invoice must be made within 60 days after the date of the invoice; lack of timely objection to an invoice shall evidence CFSB's agreement to all invoiced amounts." *Id*.

9. The Engagement Agreement also stated that "a late charge of 1% per month will accrue on undisputed amounts not paid within 30 days of the date of the invoice." *Id.*

10. Pursuant to the Engagement Agreement, claims for non-payment of amounts owed may be resolved through litigation, governed by the laws of New York. *Id*. at 8.

11. The Engagement Agreement further provides that "the prevailing party shall be entitled to recover from the other party reasonable costs and expenses, including reasonable attorneys' fees, incurred in enforcing this Agreement and reasonable attorneys' fees and costs incurred in obtaining, appealing or enforcing any judgment entered by the arbitrator or the court." *Id*.

***The Modifications***

12. The Engagement Agreement may be modified by a written agreement signed by the duly authorized representatives of each party. As contemplated by the Engagement Agreement, the parties expanded the scope of Services through multiple amendments and statements of work (collectively, the "Modifications"), including:

(a) On or about July 27, 2023, the parties executed a Statement of Work for "Enhancement of [CFSB's] BSA/AML Systems and OFAC Screening Sensitivity Testing" (the "July 2023 SOW");

(b) On or about November 16, 2023, the parties executed Amendment No. II to the July 2023 SOW, effective as of November 10, 2023, to add WatchDOG Documentation and Tuning Assistance to the scope of Services;

(c) On or about January 31, 2024, the parties executed a Statement of Work amending the July 2023 SOW to provide HotScan User Acceptance Testing Script Development to the scope of Services;

(d) On or about March 27, 2024, the parties executed a Statement of Work amending the July 2023 SOW to provide Quantaverse Decommission Analysis to the scope of Services;

(e) On or about April 29, 2024, the parties executed a Statement of Work amending the July 2023 SOW extending and expanding the AML Enhancement Services work (the "April 2024 Amendment");

(f) On or about May 6, 2024, the parties executed Amendment No. III to the July 2023 SOW to add additional risk assessment support work to the scope of Services; and

(g) On or about August 14, 2025, the parties executed a further amendment to the April 2024 Amendment continuing the AML Enhancement Services work through March 31, 2026 (the "August 2025 Amendment").

Copies of the Modifications are attached hereto as Exhibits B-H.

13. The Engagement Agreement and all subsequent Modifications form one integrated agreement (collectively, the "Agreement"). Consequently, the Modifications did not include boilerplate terms because those terms, including those relating to payment and dispute resolution, were incorporated through the Engagement Agreement.

14. On or about July 24, 2024, CFSB's Chief Compliance Officer & BSA Officer provided prior approval, as required in the July 2023 SOW, to remove the $250,000 cap applicable to the Services. A copy of the email containing this confirmation is attached hereto as Exhibit I.

15. Starting in January 2025, Guidehouse provided CFSB with an eight percent (8%) discount on its standard billing rates through March 31, 2026, and made additional investments to reduce CFSB's costs, resulting in an approximately $1 million benefit to CFSB.

16. In January 2026, Guidehouse and CFSB agreed to an extension of Services.

### *Guidehouse Performance of Services*

17. Guidehouse successfully performed its Services in accordance with the Agreement.

18. CFSB's satisfaction with Guidehouse's performance is evidenced by, among other things, (i) a nearly four-year relationship between the parties, (ii) execution of multiple Modifications extending the time period and expanding the scope of Services , and (iii) CFSB's consistent payments to Guidehouse as required by the Agreement until September 2025.

19. Prior to September 2025, CFSB never raised any concerns with Guidehouse's Services and never objected to any of Guidehouse's invoices within the 60-day objection period required by the Agreement.

### *CFSB's Breaches*

20. Starting around September 2025, CFSB's payments to Guidehouse became intermittent despite Guidehouse continuing to perform the Services in accordance with the Agreement.

21. Shortly thereafter, CFSB ceased making any payments to Guidehouse despite Guidehouse continuing to perform the Services in accordance with the Agreement.

22. When CFSB first stopped timely paying Guidehouse, CFSB failed to inform Guidehouse that any withholdings were due to quality concerns regarding Guidehouse's performance of Services.

23. As of February 2026, CFSB had not paid Guidehouse any of the $1,811,343.50 due and owing Guidehouse for its performance of the Services.

24. Accordingly, on March 26, 2026, Guidehouse's counsel sent a formal demand letter to CFSB demanding payment of the entire outstanding balance of $1,811,343.50 by April 3, 2026. CFSB has failed and refused to make any payment towards this outstanding balance. A copy of the demand letter is attached hereto as Exhibit J.

25. CFSB did not notify Guidehouse of any alleged concerns with Guidehouse's performance of the Services until March 2026.

**COUNT I**
**(Breach of Contract)**

26. Guidehouse restates and incorporates by reference Paragraphs 1 through 25 as though fully set forth herein.

27. Guidehouse and CFSB entered into a valid and binding Agreement, consisting of the Engagement Agreement, the July 2023 SOW, and all subsequent Modifications.

28. The Agreement is governed by New York law.

29. Guidehouse fully performed its obligations under the Agreement and all Services performed were in accordance with the Agreement.

30. CFSB has breached the Agreement by failing and refusing to pay Guidehouse for Services rendered in accordance with the Agreement's payment terms.

31. CFSB never timely objected to any of Guidehouse's invoices within the 60-day period provided by the Agreement, thereby agreeing to all invoiced amounts under the Agreement's terms.

32. Guidehouse has performed all conditions precedent to bringing this action.

33. As a direct and proximate result of CFSB's breach, Guidehouse has been damaged in the amount of at least $1,811,343.50, plus contractual interest at 1% per month on unpaid amounts as provided by the Agreement, and reasonable attorneys' fees and costs as provided by the Agreement.

**COUNT II**
**(Account Stated)**

34. Guidehouse restates and incorporates by reference Paragraphs 1 through 33 as though fully set forth herein.

35. In the course of performing the Services, Guidehouse issued invoices to CFSB setting forth the amounts owed for professional fees and expenses incurred.

36. Guidehouse's invoices were sent to and received by CFSB at regular intervals throughout the parties' engagement.

37. CFSB received, accepted, and retained each of Guidehouse's invoices without objection within the 60-day contractual objection period or within any other reasonable time.

38. Under New York law, CFSB's retention of Guidehouse's invoices without timely objection constitutes an implied agreement as to the correctness of the account and a promise to pay the amounts stated therein.

39. CFSB's partial payments on certain invoices further evidence CFSB's acknowledgment of the correctness of the amounts stated.

40. Despite demand, CFSB has failed and refused to pay the balance due on the account stated.

41. As a result of CFSB's failure to pay the account stated, Guidehouse has been damaged in an amount not less than $1,811,343.50, plus interest.

**COUNT III**
**(Quantum Meruit – In the Alternative)**

42. Guidehouse restates and incorporates by reference Paragraphs 1 through 25 as though fully set forth herein.

43. In the alternative, and to the extent the Agreement or any portion thereof is found to be unenforceable or inapplicable to any of the Services performed, Guidehouse asserts this claim for quantum meruit.

44. Guidehouse performed valuable professional consulting services for CFSB, including BSA/AML compliance review, system enhancement, transaction monitoring assessment, and related advisory services.

45. CFSB accepted and received the benefit of Guidehouse's Services, as evidenced by the nearly four-year engagement, multiple expansions of the scope of work, and CFSB's continued use of the work product and deliverables produced by Guidehouse.

46. Guidehouse performed the Services with the expectation of compensation, and CFSB knew or should have known that Guidehouse expected to be paid for its Services.

47. CFSB has been unjustly enriched by receiving and retaining the benefit of Guidehouse's Services without full payment therefor.

48. The reasonable value of the Services Guidehouse performed for CFSB is not less than $1,811,343.50.

49. It would be against equity and good conscience to permit CFSB to retain the benefits of Guidehouse's Services without paying their reasonable value.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Guidehouse Inc. respectfully requests that this Court enter judgment in its favor and against Defendant Community Federal Savings Bank as follows:

(a) Compensatory damages in an amount not less than $1,811,343.50;

(b) Contractual interest at the rate of 1% per month on all unpaid amounts from the date each payment became due until the date of judgment;

(c) Reasonable attorneys' fees and costs incurred in this action, as provided by the Agreement;

(d) Pre-judgment and post-judgment interest as allowed by law; and

(e) Such other and further relief as this Court deems just and proper.

Dated: New York, New York
September 17, 2026

MOORE & LEE, P.C.

By: /s/ Kristen A. Bennett

Kristen A. Bennett
NY Bar No. 507737
1115 Broadway, 12th Floor
New York, NY 10010
(212) 386-7624
k.bennett@mooreandlee.com
*Counsel for Guidehouse Inc.*